# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# ALEXANDRIA DIVISION

| | |
|---|---|
| JOE W. AGUILLARD | CIVIL ACTION NO. 1:17-CV-01671 |
| VERSUS | JUDGE TERRY A. DOUGHTY |
| LOUISIANA COLLEGE | MAG. JUDGE MARK L. HORNSBY |

## RULING

Plaintiff Joe W. Aguillard ("Aguillard") brought this lawsuit against Louisiana College ("LC"), under the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, as amended ("Title VII"). Aguillard alleges that LC discriminated against him, in part, on the grounds of his religious beliefs. Aguillard further alleges that LC retaliated against him for engaging in protected activities and for opposing LC's unlawful discrimination and actions.

Pending before the Court is a Motion for Partial Summary Judgment filed by LC [Doc. No. 21] contending solely that LC is entitled to summary judgment dismissing Aguillard's claims of religious discrimination and religious retaliation. Aguillard has filed an Opposition [Doc. No. 29]. For the following reasons, the Motion for Partial Summary Judgment is **GRANTED**.

## I.     FACTS

Aguillard served as President of LC from January of 2005 to July of 2014. He suffered a major heart attack in March of 2011 and underwent quadruple by-pass surgery. In January of 2014, he was diagnosed with Post-Traumatic Stress Disorder. Aguillard contends that, as a result of his poor health, he and LC entered into a written employment agreement effective April 15, 2014, pursuant to which he became "President Emeritus" of LC and a fully tenured member of

the Faculty at LC.  Dr. Richard B. Brewer ("Brewer") became President of LC on April 7, 2015, and continues to serve in that capacity.

On May 3, 2015, Aguillard filed a "fear of workplace violence" complaint with LC, protesting the employment of Kyle Johnson ("Johnson") by Brewer.  Aguillard contends that Johnson was one of the leaders of a group that sponsored and promoted the "Calvinist" religious belief at LC and that Johnson had previously threatened Aguillard's life.  Aguillard is not a Calvinist; he alleges that Brewer is a Calvinist.

Aguillard alleges that after he filed his "fear of workplace violence" complaint, Brewer attempted to force him to resign his employment with LC, isolated him, did not allow him to participate in the usual and customary faculty functions, and refused to communicate with him with respect to his duties and responsibilities under the Employment Agreement.

On September 28, 2015, Aguillard met with Don Benton Connor ("Connor"), an investigator hired by Brewer, who Brewer said "speaks for me".  [Doc. No. 1, p. 5]  Connor, who "appeared" to be armed with a hand gun, "represented" he was in law enforcement, stated "this is a Catholic thing," and demanded Aguillard immediately resign his position at LC "because of religious issues."  [Doc. No. 1, p. 5].  Aguillard alleges Connor followed him to his truck and physically took possession of his computers, one of which was Aguillard's personal property and the other of which had been issued to him by LC, slamming the top of one of the computers on Aguillard's hand in the process.  Aguillard had personal and confidential information stored in both computers, including e-mail communications with his attorneys, financial information, and medical records.  Both computers were password protected.  Aguillard alleges that LC "hacked" both computers and unlawfully and illegally obtained confidential information.  Aguillard was hospitalized for three weeks for treatment and observation, which he alleges was for treatment

of acute PTSD symptoms and the high risk of a second heart attack and/or stroke resulting from his confrontation with Connor.

Aguillard further contends that after his release from the hospital, Brewer continued to have him followed and stalked. Aguillard asserts that Brewer fired another faculty member, Dr. Carmacia Smith-Ross, after she refused to give a false statement to the effect that Aguillard was too ill to work, that he had not been teaching his classes appropriately, that he had not attended meetings with her as required, and that because of his disabilities (coronary artery disease and PTSD), Aguillard could not perform his job duties and responsibilities.

By letter dated January 22, 2016, Dr. Cheryl Clark, Acting Vice-President and Dean of Academic Affairs, notified Aguillard that LC considered his employment to be "at will" and that LC was entitled to dismiss him at any time and for any reason and was not obligated to show cause for his dismissal.

By email dated January 29, 2016, Brewer notified Aguillard that he was placing Aguillard on administrative leave, relieving him of all of his duties and responsibilities as "President Emeritus," and re-assigning all of Aguillard's classes.

On February 9, 2016, Aguillard filed a "whistleblower complaint" with LC's Board of Trustees reporting that Brewer had retaliated against him for engaging in protected activities and for opposing LC's unlawful discrimination and actions. On February 17, 2016, LC changed the locks on Aguillard's office, denying him access to his office and his property stored in his office.

At Aguillard's request, the Faculty Affairs Advisory Committee conducted a hearing on February 23, 2016. The Committee recommended that Aguillard be dismissed from his employment. By letter dated March 16, 2016, Brewer terminated Aguillard's employment effective March 31, 2016. Aguillard appealed Brewer's decision to the Executive Committee

3

and then to the Board of Trustees, all to no avail. LC stopped payment of all compensation under the Employment Agreement on March 31, 2016.

Aguillard filed a charge of discrimination with the EEOC and the Louisiana Commission on Human Rights on or about April 1, 2016, alleging that LC had discriminated against him because of his disability, his religion (Southern Baptist), and in retaliation for opposing illegal practices in violation of the American With Disabilities Act, as amended, 42 U.S.C. §§ 12101-12213 ("ADA") and Title VII. He stated in his claim that he believed that his opposition to Calvinistic views contributed to his discharge. He filed another charge of retaliation/ discrimination with the EEOC on July 8, 2016, setting forth more fully his religious-beliefs conflict with Brewer, and explaining Brewer is a Calvinist, whereas he is not a Calvinist. The EEOC issued a "Right to Sue" letter dated September 28, 2017.

Aguillard asserts that LC's alleged grounds for terminating him as President Emeritus and as a fully tenured faculty member were mere pretext and that LC retaliated against him for his attempt to protect his employment rights from unlawful discrimination on the grounds of his religious beliefs, his disability, his age, and his opposition to LC's discriminatory practices.

LC asserts in its motion for partial summary judgment that Aguillard's claims for religious discrimination and religious retaliation should be dismissed, with prejudice, at his costs, inasmuch as religious organizations or religious educational institutions, such as LC, are exempt from Title VII's discrimination and retaliation provisions.

The motion is fully briefed, and the Court is prepared to rule.

## II. LAW AND ANALYSIS

### A. Standard of Review

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment,

4

identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be . . . disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994). In evaluating the evidence tendered by the parties, the Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255. However, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citing *Anderson*, 477 U.S. at 248.)

  **B. Title VII**

Aguillard asserts religious discrimination and retaliation claims under Title VII.

Title 42 United States Code, Section 2000e-2(a)(1) addresses discrimination claims and

5

provides:

> It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

*42 U.S.C. § 2000e-2(a)(1).*

Title 42 United States Code, Section 2000e-3(a) addresses retaliation claims and provides, in pertinent part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees … because he has opposed any practice made an unlawful employment practice by this subchapter or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

*42 U.S.C. § 2000e-3(a)*

However, Title VII has certain exemptions applicable to religious organizations and educational institutions. Title 42 United States Code, Section 2000e-1(a) provides:

> This subchapter shall not apply to an employer with respect to the employment of aliens outside any State, or to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

*42 U.S.C. § 2000e-1(a)*

In addition, Title 42 United States Code, Section 2000e-2(e)(2) provides, in pertinent part:

> Notwithstanding any other provision of this subchapter . . . (2) it shall not be an unlawful employment practice for a school, college, university, or other educational institution or institution of learning to hire and employ employees of a particular religion if such school, college, university, or other educational institutional or institution of learning is, in whole or in substantial part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society, or if the curriculum of such school, college,

6

university, or other educational institution or institution of learning is
directed toward the propagation of a particular religion.

*42 U.S.C. § 2000e-2(e)(2)*

LC moves for partial summary judgment, contending these exemptions apply and bar Aguillard's Title VII religious discrimination and retaliation claims. Aguillard contends that the exemptions should be analyzed under the ministerial exception and ecclesiastical abstention doctrine.

The Court finds, for the following reasons, the exemptions apply and bar Aguillard's religious discrimination and retaliation claims.

In *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327 (1987), the Supreme Court said, "Section 702 of the Civil Rights Act of 1964 ... 42 U.S.C. § 2000e-1, exempts religious organizations from Title VII's prohibition against discrimination in employment on the basis of religion." (*Id.*, at 329). In further addressing the §2000e-1(a) exemption, the *Amos* Court said:

> . . . Congress acted with a legitimate purpose in expanding the § 702
> exemption to cover all activities of religious employers ... as applied
> to the nonprofit activities of religious employers, § 702 is rationally
> related to the legitimate purpose of alleviating significant governmental
> interference with the ability of religious organizations to define and
> carry out their religious missions.

*Id.*, at 339.

The preclusive effect of §2000e-1(a) was addressed by the Fifth Circuit in *EEOC v. Mississippi College*, 626 F.2d 477 (5th Cir. 1980), *cert denied*, 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981). There, the EEOC sought to enforce an administrative subpoena issued to a Baptist college in relation to alleged discrimination in hiring. *Id*. at 478-480. In ruling on Mississippi College's exemption defense, the Court said:

7

> Section 702 of Title VII exempts from the application of Title VII religious educational institutions "with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such ... educational institution ... of its activities." 42 U.S.C.§ 2000e-1
>
> * * *
>
> As discussed previously, the impact of Title VII upon the exercise of the religious belief is limited in scope and degree. Section 702 excludes from the scope of Title VII those employment practices of the College that discriminate on the basis of religion.
>
> * * *
>
> To summarize our holdings, we conclude that ... (2) section 702 of Title VII, excludes from the application of the Act any employment practices of a religious educational institution that discriminate on the basis of religion regardless of whether the religious discrimination is a pretext for some other type of discrimination ...

*Id*. at 484, 488, 489.

The Sixth Circuit has also considered this exemption. In *Hall v. Baptist Memorial Health Care Corp*., 215 F.3d 618 (6th Cir. 2000), that Circuit held a "religious educational institution" – having a direct relationship with the Baptist church – was entitled to Title VII exemption from a college employee's religious discrimination claims. *Id*. at 624-625. There, claiming a violation of Title VII, the plaintiff alleged her former employer, Baptist Memorial College of Health Sciences, had "unlawfully terminated her employment based on her religion." *Id*. at 621. The Court, as a preface to its quotation of the § 2000e-1(a) exemption, said:

> In recognition of the constitutionally-protected interest of religious organizations in making religiously-motivated employment decisions, however, Title VII has expressly exempted religious organizations from the prohibition against discrimination on the basis of religion ...

*Id*. at 623. And, prior to quoting § 2000e-2(e)(2), the Sixth Circuit further noted, "[a]nother, more specific exemption applies only to religious educational organizations …" *Id*. at 624. In recognition of these statutes, the Court found:

> The decision to employ individuals "of a particular religion" under § 2000e-1(a) and § 2000e-2(e)(2) has been interpreted to include the decision to terminate an employee whose conduct or religious beliefs are inconsistent with those of its

8

employer.

***

> The College qualifies for the exemption under the plain language of § 2000e-2(e)(2) because it is a "school, college, university, or other educational institution or institution of learning … [that] … is, in whole, or in substantial part, owned, supported, controlled, or managed by a … religious corporation."

*Id*. at 625. The Sixth Circuit concluded, "the district court did not err in determining that the College was exempt from the Title VII prohibition against discrimination based on religion." *Id*.

The Eleventh Circuit has held likewise. In *Killinger v. Samford University*, 113 F.3d 196 (11th Cir. 1997), that appellate court affirmed summary judgment dismissal of a Title VII religious discrimination claim similar to that of Aguillard. The Title VII exemption was found applicable to a Baptist university's partial dismissal of a Baptist faculty member whose religious beliefs differed from those of the school's dean.

Finally, the exemptions have been found to apply with equal force to bar retaliation claims. In disposing of and dismissing religious retaliation claims under the referenced subchapter, the court in *Saeemodarae v. Mercy Health Services*, 456 F.Supp.2d 1021 (N.D. Iowa 2006) examined applicable case law to find a religious retaliation action could not be maintained in light of the Title VII exemptions. As stated by the court:

> Saeemodarae maintains that there is a fighting issue as to whether Mercy's religious organization exemption extends to her Title VII retaliation claim even if the exemption extends to her Title VII religious discrimination claim. In *Lown v. Salvation Army, Inc*., 393 F.Supp.2d 223 (S.D.N.Y. 2005), the Court disposed of the Title VII retaliation claim of employees of a "religious organization" succinctly as follows:
>
> ["]Plaintiffs' Title VII retaliation claim must be dismissed because the broad language of Section 702 provides that '[t]his subchapter shall not apply … to a religious … institution … with respect to the employment of individuals of a particular religion …' 42 U.S.C. § 2000e-1(a). Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3(a), is contained in the same subchapter as Section 702. Accordingly, it does not apply here.["]

*Lown*, 393 F.Supp.2d at 254. This court agrees that, as a matter of **"**plain

> language," the exemption in § 2000e-1(a) for "religious organizations" from "(t)his subchapter," necessarily includes an exemption from the anti-retaliation provision in 42 U.S.C. § 2000e-(3), which is in the same subchapter. … Moreover, as Mercy contends, it makes little sense to permit retaliation claims, because to do so would erode the intended effect of the exemption, which is to recognize "the constitutionally-protected interest of religious organizations in making religiously-motivated employment decisions," … at least where the underlying claim that the employee was allegedly retaliated against for asserting is a religious discrimination claim.

(*Id*., 456 F.Supp.2d, at 1040-1041).

In *Kennedy v. St. Joseph's Ministries, Inc.,* 657 F.3d 189 (4th Cir. 2011) the Fourth Circuit, after a detailed analysis of Title VII's language, in light of guiding precedent, also found religious retaliation claims were barred by the Title VII religious discrimination exemptions.

Although LC has not asserted the ministerial exception as a basis for summary judgment, Aguillard nevertheless devotes much of his opposition to arguing that his claims are not barred by the ministerial exception because he is not a minister and LC is not a church. Furthermore, although LC has not asserted it as a basis for summary judgment, Aguillard argues in his opposition that his claims are not barred by the "ecclesiastical abstention" doctrine, which he asserts was recognized by the Louisiana Supreme Court in *LeBlanc v. Davis*, 432 So.2d 239, 241 (La. 1983), "Civil courts are prohibited from interfering in the ecclesiastical matter of a religious group, that is, in matters concerning religious discipline, faith, custom or law."

The Supreme Court has recognized a constitutionally based exception for employment of ministers. In a case under the ADA, *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171, 132 S.Ct. 694 (2012), the Court held that the Religion Clauses of the First Amendment "bar the government from interfering with the decision of a religious group to fire one of its ministers." *Id*. at 702. The Court endorsed lower court decisions that had

recognized a "ministerial exception" to laws against employment discrimination but declined to adopt a rigid formula for deciding when an employee qualifies as a minister." *Id*. at 707.

However, the issue before this Court is whether LC is entitled to partial summary judgment solely as to Aguillard's claims of religious discrimination and religious retaliation, pursuant to the exceptions for religious discrimination by religious organizations and schools in § 2000e-1(a) and § 2000e-2(e)(2). The issues as to whether Aguillard's claims are barred by the ministerial exception and/or by the ecclesiastical abstention doctrine are not before the Court. Therefore, Aguillard's analysis based on these exceptions is inapplicable.

The Court now turns to a review of whether LC qualifies for the exemptions. The parties dispute whether LC is a religious organization or is a religious educational institution and therefore qualifies for the § 2000e-1(a) and § 2000e-2(e)(2) exemptions.

With regard to the Title VII exemptions, the Fifth Circuit has not offered specific guidance. However, other courts have considered several factors in determining whether an entity is qualified. The Court finds persuasive an overview of relevant considerations set forth by the Federal district court for the Northern District of Iowa in *Saeemodarae, supra.* There, the *Saeemodarae* court examined appellate rulings which addressed this issue in depth:

> In *Hall [v. Baptist Mem. Health Care Corp*., 215 F.3d 618 (6th Cir. 2000)], the court treated the "religious school" exemption in §2000e-2(e)(2) as a more specific exemption than the "religious organization" exemption in § 2000e-1(a). ... Thus, if anything, *Hall* stated more specific factors, for purposes of the §2000e-2(e)(2) exemption, than are required for application of the §2000e-1(a) exemption. In *Hall* the court identified pertinent factors for determining whether the exemptions should apply as including an examination of the "religious nature" of the purported "religious organization," as demonstrated by such things as
> [1] whether it was supported and controlled by a religious corporation;
> [2] whether and to what extent its purpose was making the interrelated religious/service mission of the pertinent religious denomination a reality; and

> [3] whether the institution was founded by sectarian entities. *Id*. at 624-25. The court also looked at the "atmosphere" of the entity, including
> [4] whether that "atmosphere" was "permeated with religious overtones";
> [5] where and how it recruited its students or employees;
> [6] whether prospective students were informed of the religious mission of the entity;
> [7] whether incoming students were informed of the religious mission at orientation;
> [8] whether materials and facilities were decorated with religious images;
> [9] whether religious studies were required;
> [10] whether regular religious ceremonies and practices were observed; and
> [11] whether the entity hosted religious programs. *Id*. at 625. The Court held that the fact that the institution trained its students in Secular professions, in that case, health care, did not transform the institution into one that was secular. *Id.*

(*Id*. at 1036). The *Saeemodarae* court then cited an earlier appellate ruling, *Killinger v. Samford University*, 113 F. 3d 196 (11th Cir. 1997), which addressed "the qualification of an ostensibly religious university to assert the 'religious organization' exemption in § 2000e-1(a), rather than the more specific 'religious school' exemption in § 2000e-2(e)(2)." *Id*. at 1036. As noted in *Saeemodarae*:

> The *[Killinger]* court ... noted numerous factors that were pertinent to its conclusion that the university qualified for the "religious organization" exemption:
>
> [1] The college was founded as a "theological" institution by the Alabama Baptist State Convention, and while the Convention no longer had the authority to elect the school's trustees, all of the trustees were, and with only one exception, always had been Baptist;
> [2] seven percent of the institution's annual budget came from the Convention, and that sum was the largest single source of funding;
> [3] the university reported its financial status to the Convention and another Baptist institution;
> [4] the school was a member of the Association of Baptist Colleges and Schools;
> [5] all faculty were required to subscribe to the 1963 Baptist Statement of Faith and Message, and both faculty contracts and the faculty handbook affirmed this commitment;
> [6] the school's charter designated its chief purpose to be the promotion of the Christian religion;

[7] all students were required to attend chapel; and
[8] the IRS had granted the school religious exemptions. *Id*. at 199.
The *[Killinger]* court never suggested, however, that any or all of these factors were required for an institution to assert the exemption.

*Id*. at 1036-1037.

To support its arguments, LC relies on the affidavit of Brewer. Brewer avers:

(1)   LC is and has always been a private, non-for-profit educational institution;

(2)   LC is not and has never been affiliated with the State of Louisiana;

(3)   LC has never held itself out to be a public university;

(4)   LC is not dependent for its existence on public funds from the State of Louisiana, or from any other public source;

(5)   Christian faith is central to the identity and administration of LC;

(6)   LC seeks to enhance student learning and to encourage each student's Christian growth in the Baptist faith;

(7)   LC was originally chartered in 1906 as a non-profit corporation with the object "to own, operate and conduct a Baptist College, to foster Christian education";

(8)   The primary purpose of LC is to be a community of learning and free inquiry presenting a thorough and honest academic program from a Christian perspective;

(9)   LC is governed by a Board of Trustees, which is chosen by the Louisiana Baptist Convention, an association of Baptist churches in the State of Louisiana that share common religious beliefs;

(10)  According to the Faculty Handbook, Section 1.1 "The Mission and Identity of Louisiana College: The deep and profound commitment of Louisiana College as a religious institution of higher education is reflected by its long history of Christian teachings, its dedication to Christian values, and its continuing mission to provide liberal arts, professional, and graduate programs characterized by devotion to the preeminence of the Lord Jesus, allegiance to the authority of the Holy Scriptures, dedication to academic excellence for the glory of God, and commitment to change the world for Christ through the power of the Holy Spirit."

(11)  The Faculty Handbook further provides: "Louisiana College is both a partner and servant of the Christian church which supports it. The college shares the church's mission of changing the world by propagating the gospel of Jesus Christ."

(12) Prospective students are informed of the religious mission of LC, and they are provided with literature describing LC's religious educational mission. At orientation, incoming students are further advised of LC's purpose and religious mission.

(13) LC's Central Core Curriculum, as described in the Faculty Handbook, "… creates a common educational foundation for lifelong learning within a biblical worldview for all LC students. …After completing the Central Core Curriculum courses of study, students' acquired knowledge … will enable them to … demonstrate knowledge of the Bible's content and basic Christian doctrines that enable the student to explain a reasoned basis for a commitment to Jesus Christ."

(14) As a fundamental part of the Christian educational experience at LC, Chapel services are also provided for students during each semester, as well as "Chapel Livestream" for those who could not be in physical attendance at the Chapel services.

(15) The Faculty Handbook also provides: "The college recruits faculty and staff who are committed followers of Christ, who participate actively in a local church, and who are aware of and will teach or perform professionally in harmony with the doctrinal statement. The college also expects and supports the pursuit of the highest level of Christian values in the lives of faculty, staff, administration, trustees, and students."

(16) LC is funded primarily by registration income from students, which makes up 81.2% of the College's annual budget. The college's Cooperative Program/ Louisiana Baptist Convention accounts for 10.8% of the annual budget.

(17) In recognition of its status as a nonprofit religious corporation, LC routinely claims, and has consistently been granted exemption from federal income taxation under 26 U.S.C. § 501(c)(3).

Additionally, LC cites the Court to a Western District of Louisiana case where its status as a religious institution of higher education was recognized. In *Louisiana College v. Sebelius,* 38 F.Supp.3d 766 (W.D. La. 2014), the Court traced LC's history and religious background, and stated in part:

> LC is a private, coeducational institution chartered as a "non-profit corporation with the object 'to own, operate and conduct a Baptist college to foster Christian education.' … In accordance with this mission LC 'recruits faculty and staff who are committed followers of Christ, who participate actively in a local church, and who are aware of and will teach or perform professionally in harmony with

> the doctrinal statement.' … LC has … full-time employees and . . . part-time employees who are to 'exemplify a Christian lifestyle characterized by the highest standard of Christian morality by exhibiting the character of Christ and living according to the ethical principles affirmed by Holy Scripture.'"

(*Id.,* at 771, evidence citations omitted).

As a private, non-profit religious corporation and educational institution that employs individuals of a particular religion to perform work connected with the carrying on by such corporation or educational institution of its activities, LC falls within the purview of the "religious organization" exemption provided by 42 U.S.C. § 2000e-1(a). Further, the undisputed evidence shows that LC is a college and an educational institution which is in whole or substantial part supported by a particular religion (Baptist); that LC is supported by a particular religious association (Louisiana Baptist Convention); and that LC's curriculum is directed toward the propagation of a particular religion (Baptist). As such, LC also falls within the "religious school" exemption provided by 42 U.S.C. § 2000e-2(e)(2).

Aguillard argues that LC does not qualify for the exemptions, but offers no evidence to raise a genuine issue of material fact for trial. Indeed, Aguillard himself acknowledged (in part) LC's status as a religious educational institution in his Complaint, which alleges "Louisiana College is a private co-educational college . . . which is operated by the Louisiana Baptist Convention , its sole member." [Doc. No. 1, ¶ 2].

The Court finds that LC is both a "religious organization" under § 2000e-1(a) and a "religious school" under § 2000e-2(e)(2) and is therefore exempt from Title VII's prohibitions regarding religious discrimination and retaliation. Accordingly, LC's Motion for Partial Summary Judgment [Doc. No. 21] is **GRANTED**. Aguillard's religious discrimination and retaliation claims are **DISMISSED WITH PREJUDICE**.

## III. CONCLUSION

For the reasons set forth above, LC's Motion for Partial Summary Judgment [Doc. No. 21] is **GRANTED**. Aguillard's religious discrimination and retaliation claims are **DISMISSED WITH PREJUDICE.**

MONROE, LOUISIANA, this 19th day of September, 2018.

                                          **TERRY A. DOUGHTY**
                                    **UNITED STATES DISTRICT JUDGE**