# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# ALEXANDRIA DIVISION

| | |
|---|---|
| JOE W. AGUILLARD | CIVIL ACTION NO. 1:17-CV-01671 |
| VERSUS | JUDGE TERRY A. DOUGHTY |
| LOUISIANA COLLEGE | MAG. JUDGE MARK L. HORNSBY |

RULING

Plaintiff Joe W. Aguillard ("Aguillard") sued his employer, Louisiana College ("LC"), in part, for disability discrimination and disability-based retaliation after LC terminated his employment. Pending before the Court is LC's Motion for Summary Judgment [Doc. No. 48] seeking dismissal of Aguillard's claims of disability discrimination and disability-based retaliation, as well as any disability-based hostile work environment claim Aguillard may be making. Aguillard has filed an Opposition [Doc. No. 60]. LC has filed a Reply [Doc. No. 66].

Pending also is LC's Motion to Strike [Doc. No. 62] seeking to strike numerous exhibits and affidavits attached to Aguillard's Opposition.

For the following reasons, the Motion for Summary Judgment is **GRANTED,** and the Motion to Strike is **DENIED AS MOOT.**

**I.    FACTS**

Aguillard served as President of LC from January of 2005 to July of 2014. He suffered a major heart attack in March of 2011 and underwent quadruple by-pass surgery. In January of 2014, he was diagnosed with Post-Traumatic Stress Disorder. Aguillard contends that, as a result of his poor health, and as an "accommodation" to his medical disabilities, he and LC entered into

a written Employment Agreement effective April 15, 2014, pursuant to which he became "President Emeritus" of LC and a fully tenured member of the Faculty.

Aguillard asserts that on December 16, 2014, his Employment Agreement was amended by the Board of Trustees when they approved a restriction on an Anonymous Donation of $10 million which required that Aguillard remain President Emeritus for five years. [Doc. No. 60-1, p. 5].

Dr. Richard B. Brewer ("Brewer") became President of LC on April 7, 2015, and continues to serve in that capacity.

Aguillard contends that, while serving as President of LC, he was "attacked" by a group referred to as the "Calvinists." Brewer is a Calvinist; Aguillard is not. [Doc. No. 60-1, p. 5]. Aguillard asserts that these threats became increasingly hostile over time and, in fact, his life was threatened in March 2014 by a Calvinist student at LC named Kyle Johnston ("Johnston"). *Id.* at p. 3.

Aguillard's conflict with the Calvinists continued. On May 3, 2015, Aguillard filed a "fear of workplace violence" complaint after learning that LC had hired Johnston as an employee. On May 20, 2015, Aguillard met with Brewer, who Aguillard alleges, told him that he could not be "President Emeritus, it just was not going to work;" to "never, ever contact any of my vice-presidents again" under any circumstances; and to "stop talking to LC donors." *Id.*, at p. 8.

Aguillard asserts that he left the meeting devastated because there was no discussion about preserving his "accommodations." He also felt he had been left to confront the Calvinists in LC's "backyard," and, therefore, that LC had become a hostile workplace. [Doc. No. 60-29, p. 8].

2

Aguillard alleges that thereafter Brewer attempted to force him to resign his employment with LC, isolated him, did not allow him to participate in the usual and customary faculty functions, did not allow him to march at Graduation, and refused to communicate with him with respect to his duties and responsibilities. He asserts that Brewer was well aware of his medical disabilities, that Brewer controlled the "accommodations," and, consequently, Brewer could and did apply pressure to coerce him into resigning. *Id*.

Aguillard states that the Calvinists issue re-surfaced in August of 2015 when LC prepared a "recruiting" brochure or poster which featured Johnston and some of his Calvinist friends.

In September 2015, an "Anonymous Package" was circulated among LC alumni, members of the LC Board of Trustees, and the Louisiana Baptist community at large. The Anonymous Package made numerous derogatory statements about LC, about Brewer, about other LC administrators, and about current and former LC students.

On September 28, 2015, Aguillard met with Don Benton Connor ("Connor"), an investigator hired by Brewer to investigate the source of the "Anonymous Package." [Doc. No. 1, p. 5]. Brewer advised Aguillard that Connor "speaks for me." [Doc. No. 60-1, p. 10]. According to Aguillard, Connor appeared to be armed with a hand gun, represented he was in law enforcement, stated "this is a Catholic thing," and demanded Aguillard immediately resign his position at LC "because of religious issues." *Id*. Aguillard states that Connor threatened to ruin Aguillard and his family if Aguillard did not resign. *Id*.

Aguillard further alleges Connor followed him to his truck and physically took possession of his computers, one of which was Aguillard's personal property and the other of which had been issued to him by LC, slamming the top of one of the computers on Aguillard's hand in the process. *Id*.

3

Aguillard states he had personal and confidential information stored in both computers, including e-mail communications with his attorneys, financial information, and medical records. Both computers were password protected. Aguillard alleges that LC "hacked" both computers and unlawfully and illegally obtained confidential information. *Id*. at p. 11

Aguillard was subsequently hospitalized for three weeks for treatment and observation of acute PTSD symptoms and the high risk of a second heart attack and/or stroke, all, he alleges, resulting from his confrontation with Connor. *Id*.

LC contends that its investigation determined that Aguillard's LC-issued laptop contained data that identified it as the source of the Anonymous Package. [Doc. No. 48-26, p. 4]. Aguillard, on the other hand, maintains he was not personally involved in developing or distributing the Anonymous Package and further asserts that "Rev. Jerry Dark" was responsible for it. [Doc. No. 60-1, p. 15].

Aguillard further contends that after his release from the hospital, Brewer retaliated against him for his refusal to resign. He continued to have him followed and stalked. Aguillard asserts that Brewer fired another faculty member, Dr. Carmacia Smith-Ross, after she refused to give a false statement to the effect that Aguillard was too ill to work, that he had not been teaching his classes appropriately, that he had not attended meetings with her as required, and that because of his disabilities (coronary artery disease and PTSD), Aguillard could not perform his job duties and responsibilities. *Id*. at p. 11.

By letter dated January 22, 2016, Dr. Cheryl Clark, Acting Vice-President and Dean of Academic Affairs, notified Aguillard that LC considered his employment to be "at will" and that LC was entitled to dismiss him at any time and for any reason and was not obligated to show cause for his dismissal.

4

Attached to this notice was a "List of Violations" [Doc. No. 48-6, p. 3-5], which included, in summary, that Aguillard had:

(1) Breached his contractual duties to LC, through conduct materially damaging to LC, by participating in the drafting of an anonymous letter and flyer, which disparaged the college President, former students, and the school, and was transmitted to known and unknown individuals, including members of the Board of Trustees;

(2) Breached his contractual duties, by refusing to perform his duties of employment and duty to support and promote the college by participating in the drafting of the above described anonymous letter and flyer;

(3) Breached his faculty duties and was insubordinate, by failing to report perceived problems through proper channels, in that, during the summer of 2015, he sent emails to several individuals, including the former chairman of the board of LC, who were not in the immediate chain-of-command above him referencing alleged problems with LC compliance with SACS policies and procedures; and

(4) Breached his faculty duties and was insubordinate, by failing to report perceived problems through proper channels, in that, on August 10, 2015, he sent an email to the then-chairman of the board of LC, Dr. Tommy French, who was not in the immediate chain-of-command above him, referencing an alleged problem with President Brewer's appointment of certain staff members and alleged failure to obtain consent from the Board of Trustees;

(5) Breached his faculty duties and was dishonest, by covert appropriation of documents belonging to another staff member, in that, on or about April 10, 2015, he found copies of communications between another staff member and a third party on the premises of LC and on a copy machine that belongs to LC, and, without receiving the permission of the staff member to whom the copies belonged or otherwise notifying her or any other LC faculty or staff member within the proper chain-of-command, he appropriated these documents and sent them to Dr. Tommy French through an email, dated April 11, 2015. He admitted the subversive nature of his actions by stating to Dr. French that "No one knows I have it but you."

(6) Engaged in an overall pattern and practice of continued misconduct detrimental to LC in violation of his Employment Contract and the Faculty Handbook, in that his conduct during the 2014-2015 academic year, both as described above as well other actions, has reflected an overall pattern and practice of behavior demonstrating a disregard for his duties to LC.

> The cumulative effect of his continued pattern of behavior constitutes conduct detrimental and damaging to LC, and demonstrates an intention to undermine the current administration, including, among others, the College President, Dr. Rick Brewer.

*Id.*

Brewer then notified Aguillard that he was placing him on administrative leave, relieving him of all of his duties and responsibilities as "President Emeritus," and re-assigning all of Aguillard's classes. [Doc. No. 1-2].

On February 9, 2016, Aguillard filed a "whistleblower complaint" with LC's Board of Trustees reporting that Brewer had retaliated against him for engaging in protected activities and for opposing LC's unlawful discrimination and actions. [Doc. No. 60-1, p. 13]. On February 17, 2016, LC changed the locks on Aguillard's office, denying him access to his office and his property stored in his office. *Id.*

At Aguillard's request, the Faculty Affairs Advisory Committee ("FAAC") conducted a hearing on February 23, 2016. The Committee found, in summary, that Aguillard had committed the above-described violations. [Doc. No. 48-40].

Aguillard alleges that Brewer and LC introduced "false" evidence at the FAAC hearing in that they failed to disclose his Employment Agreement had a fixed term of 5 years as a result of the Board-approved restriction on a $10 Million Anonymous Donation.

The FAAC recommended that Aguillard be dismissed from his employment. By letter dated March 16, 2016, Brewer terminated Aguillard's employment effective March 31, 2016. [Doc. No. 1-4].

Aguillard appealed Brewer's decision to the Executive Committee and then to the Board of Trustees, all to no avail. LC stopped payment of all compensation to Aguillard on March 31, 2016.

Aguillard filed a charge of discrimination with the EEOC and the Louisiana Commission on Human Rights on or about April 1, 2016, alleging that LC had discriminated against him because of his disability, his religion (Southern Baptist), and in retaliation for opposing illegal practices in violation of the American With Disabilities Act, as amended, 42 U.S.C. §§ 12101-12213 ("ADA"), and Title VII. The EEOC issued a "Right to Sue" letter dated September 28, 2017.

Aguillard asserts that LC's alleged grounds for terminating him as President Emeritus and as a fully tenured faculty member were mere pretext and that LC retaliated against him for his attempt to protect his employment rights from unlawful discrimination on the grounds of his religious beliefs, his disability, his age, and his opposition to LC's discriminatory practices.[1] In his Opposition, Aguillard states that his federal claims are based principally upon the retaliatory actions taken by LC in violation of Title VII and the ADA. [Doc. No. 60-29, p. 6].

LC argues in its motion for summary judgment that Aguillard's claims of disability discrimination, disability-based retaliation, and disability-based hostile work environment should be dismissed because Aguillard has failed to assert facts showing his alleged disability was a motivating factor for any actions taken against him.

The motion is fully briefed, and the Court is prepared to rule.

## II.  LAW AND ANALYSIS

### A.  Standard of Review

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no

---

[1] This Court previously dismissed Aguillard's *religious* discrimination and retaliation claims [Doc. Nos. 30, 31].

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be . . . disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994). In evaluating the evidence tendered by the parties, the Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255. However, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citing *Anderson*, 477 U.S. at 248.)

### B. Disability Discrimination Claim

The ADA provides, in pertinent part:

> No covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).

The ADA Amendments Act of 2008 ("ADAAA") prohibits employers "from discriminating against a 'qualified individual with a disability on the basis of that disability.'" *Burton v. Freescale Semiconductor, Inc.* 798 F.3d 222, 226-27 (5th Cir. 2015) (internal quotation marks omitted) (quoting *EEOC v. LHC Grp., Inc*., 773 F.3d 688, 694 (5th Cir. 2014)).

In a termination action under the ADA, the employee may either present direct evidence that he was discriminated against because of his disability or alternatively proceed under the burden-shifting analysis first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a Title VII case. *See Benson v. Tyson Foods, Inc.,* 2016 WL3617803 at*6 (E.D. Tex. July 6, 2016) (citing *LHC Grp.,* 773 F.3d at 694; *see also EEOC v. Chevon Phillips Chem. Co., LP*, 570 F.3d 606, 615 (5th Cir. 2009)).

Direct evidence "is evidence that if believed, proves the facts of discriminatory animus without inference or presumption." *Rachid v. Jack in the Box, Inc.,* 376 F.3d 305, 310 n.6 (5th Cir. 2004).

Absent direct evidence of discrimination, a plaintiff must make a prima facie case of discrimination by showing he (1) has a disability, was regarded as disabled, or has a record of a disability; (2) was qualified for the job; and (3) was subjected to an adverse employment decision on account of his disability. *Cannon v. Jacobs Field Services North America, Inc.,* 813 F. 3d 586, 590 (5th Cir. 2016) (citing *LHC Grp.,* 773 F.3d at 697). "If he makes that showing, a presumption of discrimination arises, and the employer must 'articulate a legitimate non-discriminatory reason for the adverse employment action.'" *Id*. at 590 (quoting *EEOC v. Chevron Phillips Chem. Co*., LP. 570 F.3d 606, 615 (5th Cir. 2009)). "The burden then shifts to the plaintiff to produce evidence from which a jury could conclude that the employer's articulated reason is pretextual." *Id.* (citing *Chevron Phillips Chem. Co.,* 570 F3d. at 615.)

9

There is no direct evidence of disability discrimination in this case, so the *McDonnell Douglas* burden-shifting analysis applies. For purposes of the instant Motion for Summary Judgment only, LC does not dispute that Aguillard was disabled or that he was qualified for his job. Further, it is undisputed that Aguillard suffered an adverse employment action—he was fired. The issue then becomes whether the third prong has been satisfied, i.e, has Aguillard established a *prima facie* case by showing that he was subjected to an adverse employment decision on account of his disability.

To establish his claim of disability discrimination, Aguillard must prove his heart disease and/or PTSD was a "motivating factor" in his termination. *See Maples v. University of Texas Medical Branch at Galveston*, 524 Fed. App'x. 93, 95 (5th Cir. 2013) ("Under the ADA, 'discrimination need not be the sole reason for the adverse employment decision, [but] must actually play a role in the employer's decision-making process and have a determinative influence on the outcome.'); *see also Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 503 (5th Cir. 2002) (quoting *Ahrens v. Perot Sys. Corp.*, 205 F.3d 831, 835 (5th Cir. 2000)).

The record is devoid of any evidence that Aguillard's disability was a motivating factor in his dismissal. There is nothing to indicate that any action was taken against him on the basis of his heart disease and PTSD.

Moreover, even if the Court found that the third prong had been satisfied, triggering a presumption of discrimination, there is no genuine issue of material fact as to whether LC had "a legitimate non-discriminatory reason for the adverse employment action."

LC has produced overwhelming summary judgment evidence to show that the conflict between Aguillard and Brewer arose due to differences in opinion as to religious teachings, and, further, that LC's decision to terminate him was based on the findings of the FAAC that he had

violated his contractual and faculty duties and had demonstrated an overall pattern of misconduct that was detrimental to LC. Therefore, the burden shifted to Aguillard to introduce evidence of pretext.

If a defendant successfully meets its burden of providing a legitimate non-discriminatory reason for discharge, the plaintiff must — in a circumstantial evidence case — then offer summary judgment evidence supporting the conclusion that the defendant's proffered reasons were a pretext for discrimination. *St. Mary's Honor Center v Hicks*, 509 U.S. 502, 507-08 (1993); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-253 (1981). The "trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom…on the issue of whether the defendant's explanation is pretextual.'" *Reeves v. Sanderson Plumbing Products, Inc.* 530 US. 133, 143 (2000) A plaintiff's prima facie case of discrimination combined, with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. *Id* at 148.

Again, Aguillard has offered nothing to show LC's proffered reasons for termination were pretextual. The record indicates the turmoil between LC and Aguillard, but that turmoil had nothing to do with his disabilities.

Accordingly, LC's motion for summary judgment on Aguillard's disability discrimination claim is **GRANTED** and this claim is **DISMISSED WITH PREJUDICE**.

**C.    ADA Retaliation Claim**

In relation to all elements of an ADA retaliation claim, the Fifth Circuit has noted:

Retaliation claims asserted pursuant to the ADA also operate under the *McDonnell Douglas* framework. ... In retaliation claims, the plaintiff must ultimately show that the protected activity is the "but for" cause of the adverse employment action.

11

*Claiborne v. Recovery School District*, 690 Fed.App'x. 249, 259 (5thCir. 2017).

The elements of an ADA retaliation claim were stated in *Stringer v. North Bolivar Consolidated School District*, 727 Fed. App'x. 793 (5th Cir. 2018), as follows:

> A plaintiff can establish a prima facie case of retaliation under the ADA ... by showing that (1) she participated in an activity protected under the statute; (2) her employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse action.

(*Id.*, at 804). As to the first element, that which constitutes a protected activity was explained in *Gordon v. Acosta Sales and Marketing, Inc*., 622 Fed. App'x. 426 (5th Cir. 2015):

> As set forth in the ADA, "protected activity includes opposing employment actions or practices that are unlawful under the ADA." 2 Americans With Disabilities: Practice & Compliance Manual, § 7:398 (2015). Courts have recognized this includes filing charges with the EEOC alleging "discrimination on the basis of perceived disability." See *id* ...However, when employees make complaints about harassment without connecting the employment practices to their disabilities, these complaints do not constitute protected activity. See *Harris-Childs v. Medco Health Solutions, Inc*., 169 Fed. Appx. 913, 916 (5th Cir. 2006)

622 Fed. App'x at 431.

As to the second element,

> [t]he definition of an adverse employment action in the retaliation context is broader that in the discrimination context. See *Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs*, 810 F.3d 940, 945–46 (5th Cir. 2015) (noting that adverse employment actions for retaliation claims are not limited to the workplace, and the standard is "less demanding" than an "ultimate employment decision") (quoting *Donaldson v. CDB Inc*., 335 Fed. App'x. 494, 506 (5th Cir. 2009) (per curiam) ). It requires an adverse action that is "materially adverse" to a reasonable employee, which means that the employer's action is "harmful to the point that[it]could well dissuade a reasonable worker from making or supporting a charge of discrimination."

*Stringer*, 727 Fed. App'x. at 804 (internal citation omitted).

> Finally, the third element, a causal connection, may be met by
>
> > showing "[c]lose timing between an employee's protected activity and an adverse action against him" *McCoy [v. City of Shreveport]*, 492 F.3d at 562 [5thCir. 2007)]. Such temporal proximity must generally be "very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268,273-74 ... (2001). This Court has found, for example that "a time lapse of up to four months" may be sufficiently close ... while a five-month lapse is not close enough without other evidence of retaliation ... Such evidence may include an employment record that does not support dismissal, or an employer's departure from typical policies and procedures. ...

*Feist v. Louisiana, Dep't. f Justice, Office of the Atty. Gen.,* 730 F.3d 450, 454-55 (5th Cir. 2013).

With regard to the first element of a prima facie disability retaliation case, Aguillard asserts that the FAAC hearing and subsequent proceedings "were in direct retaliation for Dr. Aguillard's failure to resign as Brewer and Connor had demanded on September 28, 2015." [Doc. No. 60-29, p. 14]. He further contends that LC retaliated against him because he counseled or assisted other faculty members in exercising their rights and/or asserting claims under Title VII or the ADA [Doc. No. 60-29, p. 15].

With regard to the second element, Aguillard alleges that LC took materially adverse actions by attempting to force and coerce him into resigning, threatening him and his family, isolating him, not allowing him to participate in the usual and customary faculty functions, not allowing him to march at Graduation, and refusing to communicate with him with respect to his duties and responsibilities.

He further contends that LC forcibly took his computers, changed the locks to his office and the alumni house without any prior notice and without providing him a key, thereby depriving him of his personal property and medications. He also asserts that LC tried to induce others to make false statements against him.

Assuming that all of these protested actions were materially adverse, Aguillard must show that there was a causal connection between the protected activity and the adverse actions.

13

Aguillard asserts that a causal connection exists, but he offers little summary judgment evidence to support that assertion.

Nevertheless, even if Aguillard has made a prima facie case of disability retaliation, his claim fails.

The Fifth Circuit has explained:

> "If the employee establishes a prima facie case, the burden shifts to the employer to state a legitimate, non-retaliatory reason for its decision. After the employer states its reason, the burden shifts back to the employee to demonstrate that the employer's reason is actually a pretext for retaliation," *LeMaire v. Louisiana*, 480 F.3d 383, 388–89 (5th Cir. 2007) (internal citation omitted), which the employee accomplishes by showing that the adverse action would not have occurred "but for" the employer's retaliatory motive, *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, (2013) (Title VII); *Seaman*, 179 F.3d at 301 (ADA). In order to avoid summary judgment, the plaintiff must show "a conflict in substantial evidence" on the question of whether the employer would not have taken the action "but for" the protected activity. *Long v. Eastfield College*, 88 F.3d 300, 308 (5th Cir.1996) (internal quotation marks omitted).

*Id.* at 454.

LC has clearly stated legitimate, non-retaliatory reasons for terminating Aguillard following the FAAC hearing. LC has produced overwhelming summary judgment evidence to show that the conflict between Aguillard and Brewer arose due to differences in opinion as to religious teachings, and, further, that LC's decision to terminate him was based on the findings of the FAAC that he had violated his contractual and faculty duties and had demonstrated an overall pattern of misconduct that was detrimental to LC.

Therefore, the burden shifts back to Aguillard to demonstrate that LC's articulated reasons are actually pretexts for retaliation. In order to avoid summary judgment, Aguillard must show a conflict in substantial evidence on the question of whether LC would not have taken the action "but for" the protected activity.

While Aguillard may dispute the egregiousness of his activities, he has offered no evidence that LC would not have terminated another employee for engaging in the same course of behavior.

Therefore, because LC has offered sound non-retaliatory explanations for Aguillard's dismissal, and because Aguillard has presented no evidence of pretext, summary judgment must be granted dismissing his ADA retaliation claim. Accordingly, LC's motion for summary judgment on Aguillard's disability retaliation claim is **GRANTED** and this claim is **DISMISSED WITH PREJUDICE**

### D. Hostile Work Environment Claim

In its motion for summary judgment, LC states "[t]o the extent Aguillard's filings may (possibly) be read to assert hostile work environment claims, these claims should also be dismissed." [Doc. No. 48-4, p. 39]. LC then cites legal authority and advances numerous arguments in support of its position.

In his opposition, Aguillard does not address this issue or dispute LC's arguments.

Therefore, based on the unopposed arguments and evidence, LC's Motion for Summary Judgment as to any ADA-based hostile work environment claims Aguillard may be making is **GRANTED**, and this claim is **DISMISSED WITH PREJUDICE**.

### E. Failure to Accommodate

In his Opposition, Aguillard raises for the first time claims that LC failed to accommodate his purported disability. But his Complaint and his EEOC filings make no claims for failure to accommodate any disability or failure to respond to any purported request for disability accommodation.

Nevertheless, the Court has reviewed his arguments and found they do not alter the Court's conclusion that LC's motion for summary judgment should be granted.

To the extent that LC had a duty to accommodate Aguillard's disabilities, it appears that duty was satisfied when he and LC entered into the Employment Agreement in which he was allowed to step down as President and become President Emeritus as well as a fully tenured faculty member. The ADA encourages employers to confer with an employee over proposed accommodations by relieving them of liability for damages if they have made a good-faith effort to provide a reasonable accommodation in consultation with their employees. 42 U.S.C. § 1981a(a)(3) (2006).

Aguillard has failed to show what specific new accommodation he requested, how the accommodation would have been implemented, or what evidence supports the claim of any new accommodation request. Accordingly, the Court concludes this new allegation does not defeat LC's motion for summary judgment.

### F. New Claims of Disability-Based Actions

In its Motion to Strike [Doc. No. 62], LC asserts that Aguillard's Opposition and attached Affidavits seek to expand the pleadings by raising new claims and making new allegations never asserted in his Complaint.

When a claim is raised for the first time in response to a summary judgment motion, the district court should construe that claim as a motion to amend the complaint under Federal Rule of Civil Procedure 15(a). *Riley v. Sch. Bd. Union Parish*, 379 F. App'x 335, 341 (5th Cir. 2010).

When deciding whether to grant a party leave to amend, the court considers the following factors: (1) undue delay, (2) bad faith or dilatory motive, (3) repeated failure to cure deficiencies by previous amendments, (4) undue prejudice to the opposing party, and (5) futility of the

amendment. *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 864 (5th Cir. 2003) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962) ). Absent any of these factors, leave should be granted. *Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004) (citation omitted).

The Court notes that Aguillard was allowed to file his First Amended Complaint on March 1, 2019, which sets forth new allegations of intentional infliction of emotional distress. [Doc. No. 58].

The new claims of disability actions that LC objects to include multiple alleged actions by Brewer which Aguillard now alleges were based on disability. LC additionally objects to similar statements in the Affidavits of Michael Paul Shamblin and Dr. Darla Jo Gilbert.

Although the Court will consider Aguillard's response as a proposed second amended complaint, the pleading still does not cure the grounds for dismissal urged by LC. The Court has reviewed these claims and statements and has found that they do not alter the Court's conclusion that LC's Motion for Summary Judgment should be granted. Therefore, the "motion" for leave to amend is futile and is denied on that basis.

Accordingly, LC's Motion for Summary Judgment [Doc. No. 48] is **GRANTED,** and LC's Motion to Strike [Doc. No. 62] is **DENIED AS MOOT**.

### III. CONCLUSION

For the reasons set forth above, LC's Motion for Summary Judgment [Doc. No. 48] is **GRANTED**. Aguillard's claims of disability discrimination, disability-based retaliation, and disability-based hostile work environment are **DISMISSED WITH PREJUDICE.** Further, LC's Motion to Strike [Doc. No. 62] is **DENIED AS MOOT**.

MONROE, LOUISIANA, this 4th day of April, 2019.

                                            **TERRY A. DOUGHTY**
                                            **UNITED STATES DISTRICT JUDGE**